# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

TERESA MEANEY,

     Plaintiff,

     v.

NATIONSTAR MORTGAGE,

     Defendant.

Civil Action No. TDC-16-2959

## MEMORANDUM OPINION

Plaintiff Teresa Meaney ("Meaney") has brought suit against Defendant Nationstar Mortgage ("Nationstar") alleging violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f (2012), the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x; the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617 (2012); Section 12-118 of the Commercial Law Article of the Maryland Code, Md. Code Ann., Com. Law §§ 12-118, 14-202 (West 2013), and the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code. Ann., Com. Law §§ 14-201-04; and common law claims of defamation and false light. Meaney alleges that Nationstar falsely labeled her mortgage as delinquent, failed to provide proper notice of an interest rate increase, did not respond to her requests for information, and provided unnecessary notice to her ex-husband regarding her alleged delinquency. Meaney seeks actual, statutory, and punitive damages, costs, and a declaratory judgment from the Court regarding Meaney's mortgage. Pending before the Court are Meaney's Motion for Partial Summary Judgment and Nationstar's Motion for Summary Judgment. For the reasons set forth below, both Motions are granted in part and denied in part.

# BACKGROUND

## I.    Mortgage and Bankruptcy

On May 9, 2005, Meaney obtained an adjustable rate mortgage loan from Countrywide Home Loans, Inc. secured by property located on Lewisdale Road in Clarksburg, Maryland ("the Property"). As part of this transaction, Meaney and her then-husband, Michael Meaney, signed a Deed of Trust ("the Deed") as borrowers.

The Deed contained the following provision:

> **Notices.** All notices given by Borrower or Lender in connection with the Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when first mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute address by notice to lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Joint Record ("J.R.") 16.

On September 29, 2011, the Meaneys filed for Chapter 13 bankruptcy in the United States Bankruptcy Court for the District of Maryland ("the Bankruptcy Case"). The Meaneys were initially represented in the Bankruptcy Case by Timothy Sessing, who was listed as their counsel of record. Once the Meaneys filed their bankruptcy petition, they came under the protection of the automatic stay provision of 11 U.S.C. § 362(a), which, among other things,

stayed "any act to collect, assess, or recover a claim against the debtor that arose before the commencement" of the Bankruptcy Case.  11 U.S.C. § 362(a)(6) (2012).

On September 17, 2012, Michael Meaney was dismissed from the Bankruptcy Case.  The Meaneys began divorce proceedings two weeks later.  HSBC Bank USA, N.A. ("HSBC") acquired rights to the Deed on December 14, 2012, and Nationstar became the servicer of the loan for HSBC on July 1, 2013.  Seth Diamond entered an appearance as counsel of record for Teresa Meaney on September 4, 2013, but Timothy Sessing remained on the docket as her counsel as well.  On November 25, 2013, Michael Meaney executed a quitclaim deed as part of the divorce proceedings, relinquishing his interest in the Property to Teresa Meaney.  There is no allegation that either Teresa Meaney or Michael Meaney mailed any notification of the quitclaim deed to Nationstar.

## II.     Bankruptcy Consent Order

On July 29, 2014, HSBC filed a "Motion for Order Granting Relief from Automatic Stay and Co-Debtor Stay" in the Bankruptcy Case.  J.R. 48.  The Motion stated that Meaney had fallen behind on payments and was in default on the mortgage loan, owing a post-petition arrearage of $8,782.37 consisting of "5 post petition monthly payments of $1,915.01 each which were to be paid directly to [HSBC], less suspense of $792.68."  *Id.* at ¶ 7.  In support of this Motion, HSBC attached a declaration from Shemar Ursin, an Assistant Secretary of Nationstar, dated July 23, 2014, stating that $8,782.37 was "the amount necessary to cure any post-petition default on or about the date hereof."  J.R. 548.  HSBC sought to lift the bankruptcy court's automatic stay in order to initiate foreclosure proceedings on the Property.  At the time the Motion was filed, Meaney owed payments for March to July 2014.

The next day, July 30, 2014, Meaney made a lump sum payment of $8,800, plus payment fees, to Nationstar. Over the next six days, Nationstar applied these payments to Meaney's arrearage, crediting her for the payments due in March, April, May, and June 2014. This lump sum payment was not credited toward the payment due in July 2014.

In an August 27, 2014 Consent Order ("the Consent Order") signed by both parties, the bankruptcy court, with the agreement of HSBC and Meaney, ordered that the automatic stay be "terminated so as to permit [HSBC] to commence foreclosure proceedings." J.R. 53. However, pursuant to the Consent Order, HSBC was precluded from initiating foreclosure proceedings so long as Meaney complied with the rest of its terms. Specifically, Meaney was required to "cure the post-petition arrearage of $3,637.34, which amount includes payments through September 30, 2014, and includes $600.00 for legal fees and costs." J.R. 54. The bankruptcy court set out a schedule to cure this arrearage under which Meaney was required to make a payment of $1,915.01 by August 29, 2014, then make six payments of $287.05 each on the 15th day of each month from September 2014 to February 2015. Finally, Meaney was required to resume making regular monthly payments beginning with the payment due on October 1, 2014 and continuing every month thereafter.

Meaney substantially complied with the requirements of the Consent Order by making a payment of $1,956.07 on August 29, 2014 and making partial payments of $287.50 that were credited on September 15, 2014, October 15, 2014, November 17, 2014, December 16, 2014, and a final payment of $574.10 on December 23, 2014. Nationstar credited the August 29, 2014 payment toward July 2014, but did not credit the partial payments toward September 2014 when the final payment was received on December 23, 2014.

### III.  Credit Disputes

Meaney contested Nationstar's application of her payments following the Consent Order. On January 8, 2015, Meaney notified Nationstar in writing that she believed it had misapplied her payments.  Nationstar responded two weeks later, stating that it had completed an investigation of Meaney's account and concluding that it had correctly applied all received payments in accordance with the Consent Order.  On March 12, 2015, Meaney filed a complaint with the Consumer Financial Protection Bureau ("CFPB") in which she stated that "the full amount requested by [Nationstar's] attorney's office was paid immediately – on Thursday, July 31, 2014."  J.R. 158-59.  On April 24, 2015, Meaney emailed a Nationstar representative and requested that the company "credit [her] payments and make the loan current with the next loan payment due May 1st."  J.R. 163.  Meaney contacted Nationstar again by email on January 19, 2016 and challenged its application of her payments since the entry of the Consent Order up to that date.

On March 30, 2016, Meaney sent letters to Experian and TransUnion, two consumer reporting agencies ("CRAs"), to dispute the credit history relating to her mortgage.  She sent a similar letter to Equifax, another CRA, on May 17, 2016.  Although the credit reports from these CRAs had listed her as delinquent on her mortgage payments to Nationstar for several months in 2015, Meaney claimed that she was current on all payments throughout that period.  Nationstar was notified of these disputes through a system known as e-OSCAR, which allows an entity such as Nationstar to receive automated notifications from CRAs about consumer credit disputes. Rather than receive a copy of a consumer's actual dispute, Nationstar receives an Automated Credit Dispute Verification ("ACDV") through e-OSCAR each time a consumer submits a dispute to a CRA.  The basis for the consumer's dispute is not fully described in the ACDV,

which only contains a numeric dispute code with general instructions. For example, the ACDV that Nationstar received from TransUnion relating to Meaney's dispute contained the dispute code "109: Disputes Current Balance. Verify Original Loan Amount, Scheduled Monthly Payment Amount, Actual Payment Amount, Amount Past Due, Current Balance, and Original Charge-Off Amount." J.R. 544.

Nationstar received ACDVs relating to Meaney's disputes through e-OSCAR on April 7, 2016, April 14, 2016, and June 1, 2016. Each ACDV was assigned to the same Nationstar employee, Jeremy Kasza, who investigated each dispute and reviewed Meaney's loan file each time. On May 1, 2016, Kasza responded to ACDVs from TransUnion and Experian by updating Meaney's account history. The updated history listed Meaney as current for January to March 2016, but it added various notations of delinquency for March 2014 to December 2015. On May 1, 2016, Experian responded to Meaney's dispute letter by providing an updated credit history that showed Meaney delinquent for 11 of the previous 19 months. TransUnion responded the next day, showing similar discrepancies, but shifted back one month. For example, the Experian response listed Meaney as 60 days delinquent from April to July 2015, while the TransUnion response listed Meaney as 60 days delinquent from May to August 2015. Equifax sent a dispute response to Meaney on June 21, 2016, which showed delinquencies for Meaney through all of 2015.

## IV. Notices and Correspondence

Meanwhile, in a July 18, 2013 phone call between Meaney and a Nationstar representative, Meaney stated that Sessing "no longer represented her." J.R. 62. The representative advised her to have her attorney send Nationstar a letter with that information. In a separate phone call with a Nationstar representative in September 2013, Meaney identified

Diamond as her attorney in the Bankruptcy Case. Then, on August 25, 2014, Diamond submitted a complaint on behalf of Meaney through the CFPB to Nationstar. Upon receiving the Complaint, however, a Nationstar representative noted that the Bankruptcy Case still listed Sessing as Meaney's attorney. At no point did Meaney, Diamond, or Sessing send a letter to Nationstar providing formal notice that Diamond now represented Meaney in the Bankruptcy Case or that Sessing no longer represented her.

On November 5, 2014 and January 8, 2015, Nationstar sent letters to Sessing providing notice that Meaney's mortgage interest rate would increase, effective February 1, 2015, and that there would be an associated increase in her monthly payment. The letters were not sent to Meaney or to Diamond, Meaney's other counsel of record in the Bankruptcy Case. Sessing did not contact Meaney to inform her of the rate increase. Meaney continued to pay at the previous rate for three months. She learned of the rate increase on April 24, 2015, when Nationstar sent her an email informing her that she was delinquent for not paying the full amount and she discussed the matter during a phone call with a Nationstar representative. At that time, Meaney informed Nationstar by email that Sessing did not represent her. Having received notice of the rate increase, Meaney promptly cured the delinquency.

On January 14, 2016, based on her alleged delinquencies, Nationstar sent a "Notice of Intent to Foreclose" to Meaney at the Property address, stating, "You have missed one or more payments on your mortgage loan or you are otherwise in default." J.R. 188. That same day, Nationstar sent the same notice to Michael Meaney at his address in Hagerstown, Maryland. Nationstar also sent a letter to Michael Meaney, at the Property address, stating that the loan was past due for the month of December 2015 and that the letter was "sent as required by the terms of

the security instrument securing your mortgage loan." J.R. 182. Nationstar ultimately did not foreclose on the Property.

The bankruptcy court closed the Bankruptcy Case on March 15, 2016. On March 23, 2016, Diamond sent a letter to Nationstar on Meaney's behalf, with the heading "Qualified Written Request," seeking a complete loan transaction history since the initiation of the Bankruptcy Case and various other records related to Nationstar's handling of Meaney's loan. J.R. 191-92. Nationstar acknowledged receipt of Diamond's letter on April 5, 2016. Nationstar drafted a responsive letter on April 18, 2016, addressed to Meaney, but Meaney claims that she never received the letter. According to Aaryn Richardson, a Litigation Resolution Analyst for Nationstar, every letter mailed by Nationstar is placed in a "document imaging system," which stores a copy of the letter but not any associated attachments. Richardson Dep. at 78, J.R. 468. However, Meaney's "collection history profile" with Nationstar, a record of all correspondence between Nationstar and a borrower, shows no record of the April 18, 2016 letter being sent to Meaney. J.R. 459.

## V.     Medical History

Meaney alleges that Nationstar's actions have caused her to suffer adverse health consequences, in particular, the exacerbation of existing health conditions. Meaney has suffered from celiac disease and associated acid reflux since 2005. Generally, this condition can be attributed to a genetic condition and autoimmune disorder, Moreover, although Meaney has reported abdominal pain, swelling, and cramps to her health care providers, in August 13, 2015, her physician attributed Meaney's abdominal issues to past abdominal surgeries, not to stress. Nevertheless, Meaney's symptoms "flare up" during times of stress. Meany Dep. at 195-96, J.R. 402. For example, Meaney attributes the start of her symptoms to a period in 2005 when she

experienced significant financial difficulties. More recently, Meaney noted in her January 19, 2016 email to Nationstar that she had "spent many hours on the phone with Nationstar and suffered much stress and loss of sleep over this mortgage since the agreement was signed." J.R. 492.

Meaney has made regular trips to her physicians to address her symptoms and underlying conditions. In an April 4, 2017 appointment, her physician recorded that he was "concerned about the resistance of [Meaney's condition]" because even after seven years of treatment, she was still symptomatic. Despite this treatment, Meaney continues to be symptomatic, and she attributes the exacerbation of her symptoms to Nationstar's conduct.

## DISCUSSION

Meaney asserts claims against Nationstar in eight counts: (I) a violation of TILA[1] pursuant to 15 U.S.C. § 1639f and 12 C.F.R. § 1026.36(c)(1), for failing to credit payments on her mortgage loan in a timely manner, including payments made pursuant to the Consent Order; (II) a violation of Section 12-118 of the Commercial Law Article of the Maryland Code, for failing to provide adequate notice of an increase in the interest rate on her mortgage; (III) a violation of the FCRA, 15 U.S.C. § 1681s-2(b), for failing to conduct a reasonable investigation upon receiving notice from the CRAs of a consumer dispute; (IV) a violation of RESPA, 12 U.S.C. § 2605, for failing to respond to Meaney's qualified written request; (V) multiple violations of the MCDCA, Md. Code. Ann., Com. Law § 14-202, for seeking unauthorized payments and late fees relating to Nationstar's incorrect allegation that Meaney was delinquent on her mortgage, for falsely notifying the CRAs that she was delinquent on her mortgage, and for

---

[1] Although the Complaint lists this claim as a violation of RESPA, Meaney's reply memorandum in support of her Motion for Partial Summary Judgment clarified that this claim was actually for a violation of TILA.

falsely notifying her ex-husband of the same information; (VI) a false light claim for sending a notice of intent to foreclose to her ex-husband; and (VII) a defamation claim for the same mailing. In Count VIII, Meaney seeks a declaratory judgment that she has been current on her mortgage payments since no later than October 2014.

Meaney has filed a Motion for Partial Summary Judgment as to Counts I, II, IV, V, and VIII, and the inaccuracy, notice, and willfulness elements of the FCRA alleged in Count III, based largely on her contention that she has been current on her mortgage payments since the entry of the Consent Order. Nationstar has countered with its own Motion for Summary Judgment on all counts, based in part on its positions that Meaney was in fact delinquent on her mortgage, Nationstar complied with all relevant legal requirements, and there is insufficient evidence to support a claim for emotional distress damages. The Court will first consider the issue of declaratory judgment before proceeding to consider each remaining count in turn.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The nonmoving party has the burden to show a genuine dispute on a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v.*

*Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotation marks omitted). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.    Declaratory Judgment

The Declaratory Judgment Act states, "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (2012). A court may exercise jurisdiction over a declaratory judgment action when:

> (1) The complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment;
>
> (2) The court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and
>
> (3) The court does not abuse its discretion in its exercise of jurisdiction.

*Volvo Const. Equip. N. America, Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004).

Neither Party argues that declaratory relief is not appropriate in this case. Indeed, Meaney's contention that her compliance with the Consent Order brought her current on her mortgage is the primary driver behind several of her claims against Nationstar, including Counts I, III, V, VI and VII. The Court therefore finds that the Complaint alleges a sufficiently

immediate and real controversy between the parties to warrant a declaratory judgment, and that deciding this issue is not an abuse of discretion. Furthermore, the Court possesses federal question jurisdiction over at least some of Meaney's claims, providing an independent basis for its jurisdiction. Accordingly, the Court will exercise its discretion to address this claim.

Meaney argues that the Consent Order forecloses any argument that she was not current on her mortgage following its entry. According to Meaney, compliance with the Consent Order cured all of Meaney's post-petition arrearages on her mortgage through September 2014, at which point she was deemed current on the loan and agreed to return to making regular monthly payments. Nationstar argues that the Consent Order has no effect on the present litigation, and in any event, Meaney has offered no evidence that Nationstar failed to apply any payment on the mortgage in a timely manner. In Nationstar's view, the Consent Order failed to require the payment of sufficient funds to cure all of her arrearage, and it never exempted Meaney from any particular monthly payment.

Regardless of whether the Consent Order was a court order with preclusive effect, it was a written agreement entered into by both Meany and HSBC, as the holder of the mortgage, and it was signed by their counsel. It was thus a settlement agreement on the issue of post-petition debt owed by Meaney. *See, e.g., In re MI Windows and Doors, Inc., Products Liab. Litig.*, 860 F.3d 218, 225 (4th Cir. 2017) (noting that consent judgments "resemble final judgments approving settlement agreements"); *SEC v. Moss*, 644 F.2d 313, 316 (4th Cir. 1981) (holding that the district court's modification of a consent judgment was a permissible exercise of its inherent power "to supervise and aid the implementation of settlement agreements"). Such an agreement is a contractual agreement of the parties that "is to be enforced in accord with the intent of the parties." 18A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4443

(3d ed. 2017); *see also Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 211 (4th Cir. 2009) ("Settlement agreements operate on contract principles" such that their preclusive effect "should be measured by the intent of the parties"); *Keith v. Aldridge*, 900 F.3d 736, 741 (4th Cir. 1990) (holding that a settlement agreement between the parties in a previous case precluded subsequent litigation and noting that this analysis followed "from the contractual nature of consent judgments"). The interpretation of a contract is a question of law to be resolved by the Court. *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 418 (4th Cir. 2004).

In the Consent Order, dated August 27, 2014, HSBC and Meaney agreed that HSBC would receive the lifting of the automatic stay that prevented foreclosure, in exchange for a commitment that HSBC would not exercise that right to foreclose if Meaney (1) complied with a payment schedule that would resolve all post-petition arrearages up to September 30, 2014, and (2) remained current with future payment obligations. The text of the Consent Order supports Meaney's position that within this framework, the parties agreed that completion of the stated payment schedule would resolve all post-petition arrearages through September 2014. Specifically, the Consent Order stated that Meaney "shall cure the post-petition arrearage of $3,637.34, which amount includes payments through September 2014, and which amount includes $600.00 for legal fees and costs." J.R. 54. The Consent Order then stated that Meaney "shall cure the arrearage" by making (1) a payment of $1,915.01 by August 29, 2014; and (2) making six payments of $287.05 on the 15th day of each month from September 2014 to February 2015. *Id.* The Consent Order further stated, "In addition to curing the arrearage, the Debtor shall resume making regular monthly post-petition payments due under the note

beginning with the payment due on October 1, 2014 and continuing on the 1st day of each month thereafter." J.R. 54.

By referring to the curing of "*the* post-petition arrearage," including payments "through September 2014," the Consent Order can only reasonably be interpreted to resolve all amounts owed through that date. *Id.* (emphasis added). The Consent Order then referred twice to the requirement that Meaney "cure the arrearage" through the designated payment plan. *Id.* The parties would not have used such language had the agreement consisted simply of the making of a certain number of payments that could leave some unpaid debts from the period before September 2014. Whether the payment schedule actually allowed HSBC to recoup all owed payments from before September 30, 2014, or whether the parties effectively compromised to forgive one of those payments, the plain language of the Consent Order clearly evidences the parties' intent that upon payment of the stated amounts, Meaney would owe no more from the time period before September 30, 2014, and the issue would be permanently resolved without opportunity for further dispute.

Although the Court finds the agreement unambiguous, such that there is no need or basis to consider extrinsic evidence, *see Schneider v. Continental Cas. Co.*, 989 F.2d 728, 732 (4th Cir. 1993), the Court observes, in the alternative, that as part of HSBC's Motion for Relief from Stay, Nationstar Assistant Secretary Shemar Ursin provided a declaration dated July 23, 2014 stating that "as of July 8, 2014, the total post-petition arrearage is $8,782.37. *This is the amount necessary to cure any post-petition default on or about the date hereof.*" J.R. 548 (emphasis added). Since Meaney paid $8,819 to Nationstar on July 30, 2014, Meaney had, in fact, fulfilled the post-petition arrearage through the July 1, 2014 payment. Because the monthly payments at the time were in the range of $1,915.01, J.R. 548, the $3,637.34 "arrearage" covering "payments

through September 30, 2014" referenced in the Consent Order, and paid by Meaney pursuant to the terms of the Consent Order, is fairly understood to have covered the payments owed by Meaney on August 1, 2014 and September 1, 2014, in conjunction with funds remaining in her suspense account. Thus, the Consent Order was intended to, and did, cause Meaney to pay all amounts owed through September 30, 2014. Nationstar does not argue that Meaney failed to comply with the terms of the Consent Order.

To the extent that Nationstar maintains that Meaney still owed funds for obligations accruing before that date, the transaction history appears to contradict that claim. Despite representing to the Bankruptcy Court in the Ursin Declaration that $8,782.37 would, combined with $792.68 already paid, cover the five months of delinquent payments as of July 8, 2014, Nationstar credited Meaney for only four months of payments when she paid $8,819.00 on July 30, 2014. Moreover, Nationstar did not credit Meaney for September 2014, or any other month, when she made her final payment under the Consent Order on December 23, 2014.

Even if there were discrepancies in what was owed for the period before September 30, 2014, they were forgiven under the plain language of the Consent Order. Having agreed to such terms, Nationstar may not now assert that Meaney continued to owe additional amounts for obligations accruing before that date. Accordingly, the Court shall grant Meaney's request in Count VIII for a declaratory judgment and finds that Meaney was current on her mortgage through September 2014 once she complied with the terms of the Consent Order. Nationstar was therefore required to apply her payments in a manner consistent with this finding, such as by applying the full monthly payment made on September 30, 2014 to her October 1, 2014 payment, rather than applying some of it to August 2014.

## III. TILA

Count I asserts a claim against Nationstar under TILA, 15 U.S.C. § 1639f, for failing to credit her payments on the mortgage.  Under TILA:

> In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency.

15 U.S.C. § 1639f.  However, a separate section of TILA reveals that TILA creates a private right of action against only creditors, not loan servicers.  15 U.S.C. § 1640(a) (stating that "any *creditor* who fails to comply with any requirement imposed under this part . . . with respect to any person is liable to such person") (emphasis added); *see e.g.*, *Aliff v. Bank of America, N.A.*, No. 3:16-10119, 2017 WL 4248778, at *4 (S.D. W. Va. Jan 31, 2017) ("[C]ourts that have treated this subject have uniformly held that section 1640(a) does not extend liability to loan servicers.").  Meaney has not advanced any evidence that Nationstar was the holder of her mortgage loan, as opposed to the loan servicer. The Court therefore grants Nationstar's Motion for Summary Judgment as to Count I.

## IV. Section 12-118

In Count II, Meaney also alleges that Nationstar violated Section 12-118 of the Commercial Law Article of the Maryland Code by sending notice of a mortgage rate increase to her former attorney, Sessing, but not to her.  The relevant statutory provision states that:

> A lender may not enter into a loan agreement, providing for an initial interest rate pursuant to § 12-103(a) and (c) of this subtitle or § 12-306 or § 12-404 of this title, which contains a provision that permits the lender to increase or decrease the applicable rate of interest or finance charges from time to time during the term of the obligation, unless . . . [t]hrough a periodic billing statement or other written notice, the borrower is notified of the basis and effect of a change in rate, including any change in the required periodic payment amount, at least 15 days prior to the due date of the first payment that reflects the changed rate.

Md. Code Ann., Com. Law § 12-118(6). Although Section 12-118 does not apply to certain loans secured by a first mortgage on residential real property, Md. Code Ann., Com. Law § 12-103(b)(1)(ii), Meaney's mortgage does not fall within this statutory provision because it contains a prepayment penalty. *Compare* Md. Code Ann., Com. Law § 12-103(b)(1)(iii) (stating that subsection (b) only applies if "there is no prepayment penalty in connection with the loan") *with* J.R. 6 (Prepayment Penalty Addendum to Note). Since neither Party disputes that Section 12-118 applies to Meaney's mortgage, the Court will proceed to the merits of this claim.

Nationstar argues that it did not violate Section 12-118 because it provided notice of the interest rate increase to Sessing, who was listed as Meaney's counsel of record in the Bankruptcy Case at the time of the rate increase, and Nationstar was subject to the automatic stay of 11 U.S.C. § 362(a), "thus preventing Nationstar from making collection efforts or contacting Plaintiff directly." Resp. Mot. Partial Summ. J. at 18, ECF No. 71. Nationstar further argues that Meaney never sufficiently notified Nationstar that Sessing had stopped representing her, and that they should not be held responsible for Sessing's failure to keep his client informed of the rate increase. Meaney counters that she notified Nationstar on at least four separate occasions prior to the rate increase that Sessing did not represent her, or that Diamond did represent her. Moreover, Meaney notes that Nationstar was not subject to the bankruptcy automatic stay in January 2015 as a result of the Consent Order and was therefore free to contact Meaney directly.

The text of the Fixed/Adjustable Rate Note that Meaney signed when she obtained her mortgage ("the Note") supports Meaney's argument and is fatal to Nationstar. The Note specifically provides for notice of interest rate changes: "The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change." Note ¶ 4(F),

J.R. 3.  The Note further clarifies that "any notice that must be given to me under this Note will be given by delivering it or mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address."  Note ¶ 8, J.R. 4.  The Notice provision of the Deed of Trust includes similar language, and neither document directs Nationstar to provide notice of a rate increase or any other matter to Meaney's counsel rather than directly to Meaney herself at the Property address.  There is no indication in the record that Meaney ever directed Nationstar, in writing or otherwise, to provide notice of a rate increase to her counsel rather than directly to her.  Moreover, Section 12-118 directs that "the borrower" must receive notice of a rate increase at least 15 days prior to any change.  Md. Code Ann., Com. Law § 12-118(6).

Nationstar unpersuasively claims that its failure to comply with either the terms of the Note or the statute was justified because it was not permitted to contact Meaney directly under the terms of the automatic bankruptcy stay.  Upon the signing and docketing of the Consent Order on August 27, 2014, the parties agreed, and the bankruptcy court ordered, that the automatic stay was "hereby terminated so as to permit the Movant to commence foreclosure proceedings in accordance with applicable state law and pursuant to the terms of the deed of trust."  J.R. 53.  Even though Meaney remained represented by counsel in the Bankruptcy Case, Nationstar has not shown how the notice of rate increase, which did not relate to that litigation and was not sent by counsel, could not be sent directly to Meaney pursuant to the relevant provisions in the Note and the Deed of Trust and Section 12-118.  Indeed, the initial notice from the bankruptcy court to Meaney's creditors at the outset of the Bankruptcy Case stated that creditors were prohibited from "collection actions," including "contacting [Meaney] by telephone, mail, or otherwise *to demand repayment*," and "taking actions to collect money or

obtain property from the debtor," not from making routine communications about standard changes to her loan contemplated in the original Note.  Notice of Chapter 13 Bankruptcy Case, the Bankruptcy Case (Dkt. No. 9-1) (emphasis added).[2]  Accordingly, the Court finds that Meaney was not notified of the rate increase in accordance with Section 12-118 and will grant summary judgment to her on the issue of liability on Count II.

## V.    FCRA

In Count III, Meaney alleges that Nationstar violated the FCRA, specifically 15 U.S.C. § 1681s-2(b) ("§ 1681s-2(b)"), by failing to conduct a reasonable investigation upon receiving notice that Meany had submitted a dispute to a CRA.  Nationstar has moved for summary judgment on the grounds that it has reasonable procedures for receiving complaints, and a Nationstar employee actually received and responded to Meaney's disputes received from several CRAs.  Meaney has moved for partial summary judgment on the "inaccuracy, notice, and willfulness elements" of her FCRA claim.  Mot. Partial Summary J. at 2, ECF No. 72.  The elements of an FCRA claim under this provision are:  (1) the plaintiff notified the consumer reporting agency of the disputed information; (2) the consumer reporting agency notified the defendant furnisher of the dispute; and (3) the furnisher then failed to investigate and modify the inaccurate information.  *Ausar-El v. Barclay Bank Del.*, No. PJM-12-0082, 2012 WL 3137151, at *3 (D. Md. July 31, 2012).

The FCRA establishes a framework for resolving disputes regarding consumer reports.  First, consumers must notify a CRA that they dispute the completeness or accuracy of information in their consumer reports.  *See* 15 U.S.C. § 1681i(a)(2).  The CRA then must notify

---

[2]    The Court takes judicial notice of the documents filed in the Bankruptcy Case.  *See* Fed. R. Evid. 201(b)(2); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (stating that a court may take judicial notice of matters of public record).

the furnisher of the disputed information of the existence of the dispute and provide "all relevant information regarding the dispute that is received by the agency from the consumer." *Id.* § 1681i(a)(2)(B). The furnisher of information must then:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to [Section 1681a(2)];

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—

(i)   modify that item of information;
(ii)  delete that item of information; or
(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).

An "investigation" is a "detailed inquiry or systematic examination" and thus must have "some degree of careful inquiry by creditors." *Johnson v. MBNA America Bank, NA*, 357 F.3d 426, 430 (4th Cir. 2004). After a furnisher receives notice of a consumer dispute, its investigation must include a "reasonable investigation of their records to determine whether the disputed information can be verified." *Id.* at 431. In assessing the reasonableness of an investigation, a court may balance "the cost of verifying disputed information against the possible harm to the consumer." *Id.* at 432.

Whether an investigation was reasonable is ordinarily a question of fact for a jury to decide. *See id.* at 431-32 (affirming a district court's denial of a motion for judgment as a matter

of law on a § 1681s-2(b) claim because a reasonable jury could conclude, based on the evidence, that the defendant bank's investigation of disputed information was not reasonable); *see also Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1307 (11th Cir. 2016) (reversing the district court's grant of summary judgment on a § 1681s-2(b) claim because a jury could find that the defendant, a purchaser of debt, failed to review adequately available documentation to verify the plaintiff's identity); *Davenport v. Sallie Mae, Inc.*, 124 F. Supp.3d 574, 581 (D. Md. 2015) (denying summary judgment based on a genuine dispute of material fact whether the defendant loan servicer conducted a reasonable investigation of disputed information). "Summary judgment is proper only if the reasonableness of the defendant's procedures is beyond question and if the plaintiff has failed to adduce evidence that would prove the investigation was unreasonable." *Davenport*, 124 F. Supp. 3d at 581.

Here, the Court finds that there is a genuine dispute of material fact on the reasonableness of Nationstar's investigation that is appropriately left to a jury rather than resolved on summary judgment as a matter of law. The parties agree that Meaney submitted disputes of the accuracy of her credit reports to the CRAs in March 2016 and May 2016, and the record shows that the CRAs notified Nationstar that she was contesting the current balance, account status, and the accuracy of information on her account. According to an affidavit of a Nationstar Vice President, Nationstar had an employee conduct an investigation that included a review of Meaney's loan file, but the details of that investigation were not specified. As discussed above, however, Meaney has demonstrated that the Consent Order resolved her post-petition arrearages on her mortgage through September 2014, such that her September 30, 2014 payment should have been applied to October 2014 rather than August 2014. *See supra* Part II. As a result, the claims by Nationstar to the CRAs that she was delinquent on her mortgage were inaccurate.

Where Nationstar's unspecified investigation failed to uncover the inaccuracy, there is, at a minimum, a genuine issue of material fact whether Nationstar's investigation was reasonable. *See Johnson*, 357 F.3d at 431 (finding a genuine issue of material fact whether an investigation was reasonable where the plaintiff had disputed a credit report entry on the grounds that she was not the co-obligor on the account, and the resulting investigation was limited to confirming that the name and address listed on the dispute form were the same as in its computerized account information system and noting that the records reflected that the plaintiff was the sole responsible party on the account).

Moreover, Nationstar had received specific information that Meaney's dispute related to Nationstar's failure correctly to apply the terms of the Consent Order. In a letter dated January 8, 2015, Meaney's attorney wrote to Nationstar directly to dispute the mortgage account information. On January 23, 2015, Nationstar sent a responsive letter in which it acknowledged that Meaney had invoked the Consent Order to contest her alleged delinquency and asserted that upon its own review of the Consent Order and Nationstar records, it maintained that she continued to owe past due amounts. Meaney later informed Nationstar directly, in a November 2015 telephone call, that she specifically disputed Nationstar's application of funds following entry of the Consent Order, which she referenced as "an agreement in federal court" for which "the documents were sent in over a year ago." J.R. 102. "When a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly." *Hinkle*, 827 F.3d at 1306 (rejecting "the proposition that a furnisher may truncate its investigation simply because the CRA failed to exhaustively describe the dispute in its § 1682i(a)(2) notice"). Particularly with this information in Meaney's file, a reasonable jury could

conclude that an investigation that failed to uncover the inaccurate post-Consent Order accounting was unreasonable. *See Davenport*, 124 F. Supp. 3d at 581 (denying summary judgment to a defendant where despite limited information provided by the CRAs relating to the dispute, documents in the defendant's own files would have revealed information calling into question the accuracy of the reported delinquency on plaintiff's account).

Nationstar's reliance on *Alston v. United Collections Bureau, Inc.*, No. DKC-13-0913, 2014 WL 859013 (D. Md. Mar. 4, 2014), is misplaced. In *Alston*, the court found that summary judgment was appropriate where a furnisher of information conducted a review based on the limited information provided through the ACDV system. *Id.* at *9. The court reasoned that when a furnisher receives notice from a CRA that an account does not belong to the consumer, a reasonable investigation can consist of verifying the name, address, and social security number of the consumer. *Id.* at *7. However, the court also noted that a furnisher may have to conduct a more thorough investigation when it has knowledge of the specific nature of a consumer's dispute. *Id.* at *8; *see also Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 n. 11 (9th Cir. 2009) ("In deciding that the notice determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken."). In this case, Meaney has presented considerable evidence that Nationstar was fully aware of her specific dispute, including the dispute involving the application of funds following the Consent Order, such that a jury could find that Nationstar did not undertake a reasonable investigation in response to her disputes.

Where Nationstar had access to the Consent Order and the relevant records, but failed to uncover its error, a jury could reasonably conclude that Nationstar failed to conduct a reasonable investigation in response to Meaney's dispute. Nationstar's motion for summary judgment on

this count will therefore be denied.  As for Meaney's motion for partial summary judgment, the Court grants summary judgment to Meaney to the extent that it finds that she notified the CRAs of her dispute, the CRAs in turn notified Nationstar, and that the information Nationstar provided to the CRAs alleging that she was delinquent on her mortgage was inaccurate.  The Court denies summary judgment on the reasonableness of the investigation and whether Nationstar acted willfully, which are matters for which there are genuine issues of material fact.

## VI.    RESPA

In Count IV, Meaney alleges that Nationstar violated RESPA, 12 U.S.C. § 2605, by failing to respond to a letter sent by her attorney to Nationstar on March 23, 2016.  Under RESPA, a loan servicer such as Nationstar that receives a borrower inquiry in the form of a "qualified written request" ("QWR") has a duty to respond in writing within 30 days of receiving the QWR.  12 U.S.C. § 2605(e).  Nationstar does not dispute that the March 23, 2016 letter was a QWR under RESPA, but argues that it responded to Meaney within the statutory timeframe.  As proof, Nationstar has identified a letter from Nationstar to Meaney, dated April 18, 2016, which responds to the issues raised in the QWR.  Meaney does not dispute that the letter is responsive to her request, but she claims that neither she nor her attorney ever received it.

"Absent strong evidence to the contrary," parties are presumed to have received notices that were mailed to them.  *Bosiger v. U.S. Airways*, 510 F.3d 442, 452 (4th Cir. 2007).  This presumption attaches when a party provides evidence that the item was addressed, stamped, and mailed, and mailing can be proven through evidence of "mailing custom or routine practice." *Rios v. Nicholson*, 490 F.3d 928, 933 (Fed. Cir. 2007); *see also Barnett v. Okeechobee Hosp.*, 283 F.3d 1232, 1240 (11th Cir. 2002); *United States v. Green*, 745 F.2d 1205, 1208 (9th Cir. 1984).  A general denial of receipt is insufficient to overcome this presumption.  *Bosiger*, 510

F.3d at 452. However, the presumption may be rebutted by facts showing that the letter was never actually received. *Rios*, 490 F.3d at 933.

Here, Nationstar has provided evidence that the existence of the April 18, 2016 letter in its records signifies that it was mailed. According to Nationstar Litigation Resolution Analyst Aaryn Richardson, an employee "familiar with the process in which [the April 18, 2016 Letter was] generated," Nationstar scans every letter that it mails into a document imaging system. J.R. 468. Nationstar has thus shown a routine practice of mailing all scanned letters sufficient to attach the presumption that the letter went out. Richardson's deposition, however, also provides Meaney's basis for challenging receipt of the letter. According to Richardson, Nationstar's "collection history profile" is a record of all correspondence between Nationstar and a borrower. J.R. 459. Meaney's collection history profile shows no record of the April 18, 2016 letter being sent to Meaney. *See* J.R. 118.

Where this absence of an entry in Nationstar's records supports Meaney's contention that letter proffered as a response to her QWR was never mailed, there is a genuine dispute of material fact that is best resolved by a factfinder. Accordingly, the Court will deny both Motions for Summary Judgment on the RESPA claim.

## VII.   MCDCA

In Count V, Meaney asserts that Nationstar violated several provisions of the MCDCA, Md. Code Ann., Com. Law § 14-202, by improperly sending her notices that she was delinquent on her mortgage, demanding loan payments and charges that it knew it was not entitled to collect, and sending her a foreclosure notice; falsely reporting Meaney as delinquent to various CRAs; and sending a notice of intent to foreclose to her ex-husband, despite his lack of a legal interest in the Property. The Court considers each alleged violation in turn.

### A.      Debt Collection Activities

Meaney asserts that, beginning in October 2015, Nationstar regularly sent her statements that she was past due on her mortgage and demanded various late fees and other penalties, ultimately leading to a Notice of Intent to Foreclose sent to Meaney on January 14, 2016.  The MCDCA prohibits debt collectors from using threatening or fraudulent methods while attempting to collect a delinquent debt.  Md. Code Ann., Com. Law § 14-202.  Under the MCDCA, a debt collector cannot "[c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist."  *Id.* § 14-202(8).  "Maryland courts have consistently interpreted the MCDCA to require plaintiffs to allege that defendants acted with knowledge that the debt was invalid, or acted with reckless disregard as to its validity."  *Lembach v. Bierman*, 528 F. App'x 297, 304 (4th Cir. 2013); *see also Kouabo v. Chevy Chase Bank, F.S.B.*, 336 F. Supp. 2d 471, 475 (D. Md. 2004) ("This has been held to mean that a party may not attempt to enforce a right with actual knowledge or with reckless disregard as to the falsity of the existence of the right.").

As discussed above, Meaney has shown that her compliance with the Consent Order rendered her current on her mortgage through September 2014.  *See supra*, Part II.  This finding does not alone establish that she remained current from October 2015 to January 2016.  But the repeated reports of delinquency since then derive at least in part from Nationstar's insistence that she was not current as of September 2014, because even though Meaney generally made regular payments from October 2015 to January 2016, her later payments were applied to earlier months rather than the current month.  Thus, she has, at a minimum, established a genuine issue of material fact that she was not actually delinquent during some or all of that time period.  Where the plain language of the Consent Order notified Nationstar that after complying with its terms

she was current as of September 2014, Meaney has also shown a genuine dispute of material fact over whether Nationstar acted with knowledge or reckless disregard of the invalidity of its claims to late fees and the right to foreclose on Meaney's house. Accordingly, the Court will deny both Meaney and Nationstar's Motions for Summary Judgment on the MCDCA claim arising out of the demands for arrears and late fees imposed since October 2015.

### B. Reports to CRAs

Relatedly, Meaney asserts that Nationstar falsely reported Meaney as delinquent to several CRAs. Under the MCDCA a debt collector may not "disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false." Md. Code Ann., Com. Law. § 14-202(3). Furthermore, a debt collector cannot "disclose or threaten to disclose to a person other than the debtor . . . information which affects the debtor's reputation, whether or not for credit worthiness, with knowledge that the other person does not have a legitimate business need for the information." *Id.* § 14-202(5). However, as applied to disclosures to CRAs, this state law claim is explicitly preempted by the FCRA, which provides that "[n]o requirement or prohibition may be imposed under the laws of any State with respect to any matter regulated under section 1681s-2 of this title." 15 U.S.C. § 1681t(b)(1)(F); *see Ross v. FDIC,* 625 F.3d 808, 812-13 (4th Cir. 2010) (holding that plaintiff's claim that the defendant bank violated North Carolina law by reporting inaccurate credit information to a CRA was "squarely preempted" by FCRA). Accordingly, the Court will grant Nationstar's Motion for Summary Judgment as to Meaney's MCDCA claim arising out of Nationstar's reports to CRAs.

### C. Notice to Michael Meaney

Meaney further alleges that Nationstar violated the MCDCA by sending a Notice of Intent to Foreclose to Michael Meaney on January 14, 2016. According to Meaney, Nationstar knew that her ex-husband did not "have a legitimate business need for the information" because he was never a party of to the mortgage note, he executed a quitclaim deed in 2013 relinquishing any right to the Property, and Meaney repeatedly notified Nationstar that Michael Meaney was no longer associated with the Property.

This argument is not supported by the record. The Deed of Trust specifically required Meaney to notify Nationstar, in writing, by delivery or first class mail, of any changes in connection with the Deed. Although Meaney stated that Michael Meaney was no longer on the deed in various calls to Nationstar and the March 12, 2015 CFPB complaint, there is no evidence that she or Michael Meaney ever mailed or delivered a notice to Nationstar in conformity with the procedures outlined in the Deed of Trust. Although Meaney claims that Nationstar should have known of Michael Meaney's 2013 quitclaim deed, she has not identified, nor has the Court found, any authority to support her proposition that a public record is a permissible substitute for this contractual notice procedure. Since Michael Meaney was listed as a borrower on the Deed of Trust, Nationstar was obligated to send him a notice when it deemed the loan in default. *See* J.R. 18 ("Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument"). The Court accordingly grants Nationstar's Motion for Summary Judgment as to Meaney's MCDCA claim regarding the Notice of Intent to Foreclose sent to Michael Meaney.

**VIII. Defamation and False Light**

Finally, Meaney alleges that Nationstar defamed her and placed her in a false light by sending a notice of intent to foreclose to her ex-husband, Michael Meaney, on January 14, 2016. Under Maryland law, to establish a *prima facie* case of defamation, a plaintiff must establish that (1) the defendant made a defamatory statement to a third person (a requirement known as publication); (2) the statement was false; (3) the defendant was legally at fault in making the statement; and (4) the plaintiff thereby suffered harm. *Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001). Under the first element, a defamatory statement is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Id.* (quoting *Rosenberg v. Helinski*, 616 A.2d 866, 871 (Md. 1992)). Under the second element, a statement is "false" if it was "not substantially correct." *Piscatelli v. Van Smith*, 35 A.3d 1140, 1147 (Md. 2012). Establishing the third element, that a defendant is legally at fault, requires a showing that, at a minimum, the party making the false statement acted negligently. *Hearst Corp. v. Hughes*, 466 A.2d 486, 490-92 (Md. 1983). For the fourth element, actual harm must generally be established. *Id.* at 493; *Shapiro v. Massengill*, 661 A.2d 202, 217-18 (Md. Ct. Spec. App. 1995).

Meaney's defamation claim fails because Michael Meaney was not a third party for the purposes of the Notice of Intent. "Publication occurs as soon as the words are communicated to a person other than the person or persons defamed." 53 C.J.S. Libel and Slander § 93 (2017); *see also ICF Tech., Inc. v. Google, Inc.*, No. C13-2068JLR, 2013 WL 678826, at *3 (W.D. Wash. Dec. 20, 2013) (finding persuasive a defendant's argument that it could not be liable for defamation because any defamatory statement was sent only to the plaintiff and the plaintiff's clients, all of whom were "persons defamed") (citing *Pate v. Tyee Motor Inn, Inc.*, 467 P.2d 301,

302-03 (Wash. 1970)).  The allegedly defamatory notice does not single out Teresa Meaney as delinquent on the mortgage, but is rather directed to Michael Meaney as a borrower under the Deed of Trust.  As discussed above, Meaney was validly subject to Nationstar's notices.  *See supra*, Part VII.C.  Indeed, the letter sent to Michael Meaney states that "you have missed one or more payments on *your mortgage loan* or *you are* otherwise in default," the exact allegedly defamatory language used in the letter sent to Teresa Meaney that same day.  J.R. 185, 188 (emphasis added).  Since Nationstar's notice sent to Michael Meaney described a default by him, not Teresa Meaney, it did not communicate words to a person other than the person defamed.  The Court will therefore grant Nationstar's Motion for Summary Judgment as to Meaney's defamation claim in Count VII.

Meaney's false light claim, based on the same statements identified above, fails to state a claim for a similar reason.  The elements of a false light/invasion of privacy claim under Maryland law are:  (1) the defendant gave "publicity to a matter concerning another that places the other before the public in a false light," (2) "the false light in which the other person was placed would be highly offensive to a reasonable person," and (3) the defendant "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Bagwell v. Peninsula Reg'l Med. Ctr.*, 665 A.2d 297, 318 (Md. Ct. Spec. App. 1995) (quoting Restatement (Second) of Torts § 625E (Am. Law Inst. 1977)).  Under Maryland law, "[r]egardless of whether a declaration is styled as a defamation action or an invasion of privacy action, the same considerations and legal standards apply." *AIDS Counseling & Testing Ctrs. v. Group W Television, Inc.*, 903 F.2d 1000, 1004 n.1 (4th Cir. 1990) (alteration in original) (quoting *Phillips v. Wash. Magazine, Inc.*, 472 A.2d 98, 101 n.1 (Md. Ct. Spec. App. 1984)).

The publication deficiencies of Meaney's false light claim are even more pronounced because a false light claim requires a defendant to communicate "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F. Supp. 1263, 1278 (D. Md. 1992). Even under Meaney's theory that Michael Meaney was a third party, disclosure to a single individual is insufficient to meet the publication requirement. *See Henderson v. Claire's Stores, Inc.*, 607 F. Supp. 2d 725, 733 (D. Md. 2009) (holding that statements made within earshot of a small group of individuals in a public place did not constitute public disclosure for purposes of a false light claim). The Court will therefore grant Nationstar's Motion for Summary Judgment as to Meaney's false light claim in Count VI.

## IX. Emotional Distress Damages

Finally, Nationstar moves for summary judgment on Meaney's claims that she suffered emotional distress as a result of Nationstar's actions. Nationstar argues that Meaney has not shown that her symptoms were caused by Nationstar's actions, noting that there is no discernible difference between the medical records of her doctors before and after Nationstar began servicing Meaney's loan. Meaney counters that her testimony regarding her own symptoms is sufficient to at least establish a genuine dispute of material fact that should be resolved at trial.

In order to establish a claim for emotional distress damages, a plaintiff must "reasonably and sufficiently explain the circumstances of the injury and not resort to mere conclusory statements." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007) (quoting *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1251 (4th Cir. 1996)). The appropriate calculation of emotional distress damages is based on the overall context of the emotional distress, corroborating evidence of the plaintiff's testimony, the apparent connection between the

defendant and the emotional distress, the degree of the alleged distress, physical injuries and medical attention from the distress, and any loss of income. *Sloane*, 510 F.3d at 503. An award of emotional distress damages may be based on the plaintiff's testimony and does not necessarily require medical evidence. *See id.* In *Sloane*, the Fourth Circuit upheld in part an emotional distress damages award in an FCRA case based on testimony by the plaintiff and her husband that erroneous credit reports caused severe anxiety apparent to others, insomnia, and marital discord that led the couple to consider separation. *Id.* at 503-04.

Here, Meaney has provided sufficient evidence to support her claim that she has suffered emotional distress damages as a result of Nationstar's actions. First, Meaney has established that the Consent Order should have brought her current on the mortgage through September 2014, and Nationstar's continued allegations that she was delinquent objectively supports an "objective and inherently reasonable factual context for her resulting claims of emotional distress." *Id.* Second, in the midst of her dealings with Nationstar, Meaney revealed in an email to Nationstar dated January 19, 2016 that having "spent many hours on the phone with Nationstar," she had "suffered much stress and loss of sleep over this mortgage." J.R. 492 Third, Meaney has connected the impact of this stress to a medical condition. For several years, Meaney has suffered from various abdominal issues, which were documented by healthcare providers in March 2014 and August 2015. Although her physician, in August 2015, attributed her abdominal pain to past abdominal surgeries, Meaney has testified that her symptoms "flare up" in times of stress. J.R. 402. Significantly, in April 2017, her gastroenterologist noted that she continued to suffer abdominal pain and that the symptoms and failed to respond to treatment. Meaney has presented evidence consistent with her position that Nationstar's activities exacerbated her ongoing abdominal pain. Thus, Meaney has provided more than mere

conclusory allegations of emotional distress injury. Although Nationstar correctly argues that the evidence does not conclusively establish its responsibility for Meaney's admittedly long-existing health problems, summary judgment on the issue of emotional distress damages is not appropriate based on this record.

## CONCLUSION

For the foregoing reasons, Meaney's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART, and Nationstar's Motion for Summary Judgement is GRANTED IN PART and DENIED IN PART. Meaney's Motion is GRANTED as to Count II, the notice and inaccuracy elements of Count III, and Count VIII, with the Court finding that Meaney's compliance with the terms of the Consent Order rendered her current on her mortgage through September 30, 2014. Nationstar's Motion is GRANTED as to Counts I, VI, and VII, and as to the claims under Count V relating to Nationstar's notices to the CRAs and Michael Meaney. Both Motions are otherwise DENIED as to the remaining counts. A separate Order shall issue.

Date: February 21, 2018

THEODORE D. CHUANG
United States District Judge

33